**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**MICHAEL HOUSTON,**

      **Petitioner,**

**vs.**

                                     **CASE NO. 4:07cv358-SPM/WCS**

**WALTER A. McNEIL,**

      **Respondent.**

_____/

### REPORT AND RECOMMENDATION

      This is an amended petition for writ of habeas corpus filed by Michael Houston pursuant to 28 U.S.C. § 2254.  Doc. 7.  Petitioner challenges his conviction after a jury trial for sexual battery on a child under 12 years of age by a person over 18 years of age and lewd and lascivious molestation, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2003CF13A1.  Petitioner is serving a life sentence for the first charge.

      Respondent filed an answer, doc. 16, and the record in paper form.  Petitioner filed a memorandum with his petition, doc. 8, and a traverse, doc. 18.  Respondent agrees that the petition was timely filed.  Doc. 16, p. 5.

**The trial evidence**[1]

S. R.,[2] the victim, testified that she was nine years old on the evening of

December 31, 2002.  Ex. B, trial transcript, p. 34-35.  It is judicially noted that that

evening, New Year's Eve, was a Tuesday.  S. R. was at home and she, her cousin, and

"Otica" slept in the front room that night.  *Id.*, p. 35.  Her mother was not home because

she had gone to the hospital "with someone that had got stabbed 14 times."  *Id.*, p. 38.

Petitioner was "babysitting" them.  *Id.*, p. 47.

S. R. said that she and her sister, Jessica Kelly, tried to go to the bathroom that

night, but Petitioner would not let them.  *Id.*, p. 36.  He pulled the back of her pajama

shirt, and had a belt in his hand, and he whipped her sister in the eye with the belt.  *Id.*

S. R. said that there was a bunkbed in the room, and Otica was lying on the bottom

bunk and her cousin was on the floor.  *Id.*  Her sisters, Jessica and Brittney, were

younger than S. R..  *Id.*, pp. 36-37.  S. R. said she slept on the top bed.  *Id.*, p. 37.

S. R. said that later that night, at about 3:00 a.m., she felt her bed shaking and

she felt "something hard" inside her in the front, where she went to the bathroom.  *Id.*,

pp. 37-38.  She did not have a name for the place.  *Id.*, p. 38.  She had her pajamas on.

*Id.*, p. 38.  She said her underwear went to one side, and the next day she found a hole

in her pajama bottoms.  *Id.*, p. 39.  The pajama bottoms were new, a Christmas gift, and

---

[1] Since there is a claim that the evidence was insufficient for conviction, the trial
evidence is extensively reported here.

[2] Due to her age, the name of this victim will not be used in this report and
recommendation.

were blue with rabbits on them, and did not have any holes when she went to bed the

night before.  *Id.*, pp. 39-40.

S. R. said that later that morning, Petitioner "went to the store or somewhere" to

buy a quart of beer, and when her aunt came, Brittney told her aunt "everything" and

her aunt locked the door to keep Petitioner out.  *Id.*, pp. 40, 43.  The pajamas were

admitted into evidence.  *Id.*, p. 41.  S. R. said that the next morning, her cousin Otica

informed S. R. that "he was doing like nasty stuff."  *Id.*, p. 42.  S. R. said that Otica,

"was like upset" and they "all told her [her aunt] what happened," and her aunt called

the police.  *Id.*, p. 44.

On cross examination, S. R. said that that night, Petitioner spanked her little

sister, Jessica.  *Id.*, pp. 47-48.  She explained:

> Well she wasn't misbehaving.  She tried to got to the bathroom and he
> wouldn't let her because he thought she was playing, but she wasn't.  And
> she made a mistake and peed in her clothes.

*Id.*, p. 48.  She said again that she was on the top bunk.  *Id.*  Brittney was "on the

bottom in the back."  *Id.*  It was possible, however, that S. R. and Brittney were both on

the bottom bunk.  *Id.*, p. 49.  She also said that in addition to her and Brittney, her

cousin Otica and little sister Jessica were "in the bed together."  *Id.*

S. R. was asked, "but you don't really know what happened; do you?" and she

said, "I don't."  *Id.*  She was asked, "You never saw Michael Houston get on top of you;

did you?" and she said, "No, sir."  *Id.*, pp. 49-50.  She admitted that she had not seen

Petitioner "take his penis out," and she knew what a penis was.  *Id.*, p. 50.  She

repeated that she felt "some kind of shaking in the bed," but said, "well, no," when

asked, "You don't know who caused the shaking?"  *Id.*, pp. 50-51.  She said that she

herself knew "part" of what happened, but she "never saw Michael do anything" to her. *Id.*, p. 51.  She admitted that both her sister and her cousin told her later what had happened.  *Id.*  She was asked, "And that's why you figure you know what happened, right?" and she said, "Yes, sir."  *Id.*

On cross examination, S. R. said that Petitioner had done "something" to her before, and did not remember providing a different answer in her deposition.  *Id.*, pp. 53-54.  She said that her pajama bottoms were on when she awoke, and she had no recollection of agreeing in her deposition that her pajamas were on the floor.  *Id.*, p. 54.  She was asked, "The only reason you told the police and everybody was because other people told you what happened, not because you know what happened; is that right?" and she said, "Yes, sir."  *Id.*

She said that Otica and Brittney told her the next morning what had happened.  *Id.*, p. 55.  She said that she was on her stomach when Petitioner was on top of her.  *Id.*  She also said that Otica and Brittney said that she was on her stomach.  *Id.*  She said that Otica told her that Petitioner entered her anus (her "poop hole").  *Id.*, p. 56.

On redirect, S. R. said that when she was sleeping on her stomach, she did not feel someone on top of her, but she felt something hard inside, and she never saw the person with her eyes.  *Id.*, p. 57.  She was asked in a followup question about the time that Petitioner had done something to her before, and she first said she did not remember that, and then said it was at her aunt's house.  *Id.*  It was the summer after first grade.  *Id.*, p. 58.  She was sleeping on the floor.  *Id.*  When asked whether Petitioner touched her in any way, she said, "I really don't know."  *Id.*, p. 59.

Petitioner's attorney returned to this testimony again, bringing to S. R.'s attention that in her deposition she had said that Petitioner had never touched her before, and the prosecutor objected, stating that this was misleading because later in the deposition "she says it did happen." *Id.*  The objection was overruled.  *Id.*, p. 60.  The prosecutor returned to the deposition and read passages where S. R. had said that twice before, Petitioner had placed his finger or another hard object in her anus.  *Id.*, p. 61.  S. R. said she remembered saying that in the deposition.  *Id.*, p. 62.  On recross, S. R. said she told her aunt about those earlier incidents.  *Id.*  Then she denied that she told her aunt. *Id.*, p. 63.

Otica Williams, who was 13 years of age when she testified, said she was S. R.'s cousin.  *Id.*, pp. 64-65.  She said no one was at S. R.'s home when she, S. R., and her little cousin were left there by S. R.'s grandmother.  *Id.*, pp. 65-66.  S. R.'s mother came home, but "they had to go somewhere."  *Id.*, p. 66.  Otica said that Petitioner went to the store, got some beer, and was drunk.  *Id.*  She said he drank five or ten beers that night, and was tripping over things.  *Id.*, p. 71.

Otica Williams said that Petitioner "went back there in the room," and "must have thought I was asleep, but I wasn't."  *Id.*, p. 66.  She said, "And I was following right behind him to see what he was fixing to go do."  *Id.*, p. 67.  Otica said she "couldn't hardly see because the lights was off," but he saw Petitioner try to pull S. R. off the bed, "like picking her up," "trying to slide her."  *Id.*  She thought he was trying to have sex with her when he "got on top of her."  *Id.*  She said, "When she was laying on her stomach and he got up, like laying on top of her back."  *Id.*, p. 68.  She said, "he tried to take off her pants, but she was moving around too much."  *Id.*  She said that Petitioner

was moving, below the waist, up and down on S. R.  *Id.*  Otica said that S. R. was

"sleep[ing] hard so she don't hardly feel or hear nothing," and was "like moving around

and stuff trying to get cover on her."  *Id.*, p. 69.  Otica said that she stepped on a toy,

and Petitioner heard her and got up to see what that was.  *Id.*, p. 69.  Otica ran back to

the front room and got into bed.  *Id.*  Petitioner got up and left.  *Id.*  Otica "went back

there and woke [S. R.] and the other kids."  *Id.*

Otica Williams said that before she and the other children had gone to bed,

Petitioner was trying to make them go to bed, but they told him it was the weekend and

that could stay up "because that's what her mom said," and he hit S. R.'s little sister,

Jessica, in the face with a belt.  *Id.*, p. 70.

On cross examination, Otica Williams said that Petitioner is her uncle.  *Id.*, p. 72.

She said that Petitioner was trying to hit S. R. with the belt, and hit Jessica by mistake.

*Id.*, p. 75.  She said "we was all in the same bed when I went to sleep."  *Id.*, p. 76.

"Some – like one was sleeping on the top and some were sleeping at the bottom," and

the beds were bunk beds.  *Id.*  She acknowledged that Brittney was S. R.'s sister.  *Id.*,

p. 77.  She said that there were three children on top and two on bottom.  *Id.*.  She then

said, however, that S. R., Jasmine,[3] and Brionne were on the bottom bed.  *Id.*  She

again said that S. R., Jasmine, Brionne, were in the bottom bed when Petitioner was on

top of S. R., and the others were on the top bed.[4]  *Id.*, p. 78.  The bunk beds were in the

back room.  *Id.*, p. 79.  Otica Williams said she was sure she saw Petitioner on top of  S.

---

[3] Later there is testimony that Jasmine is also called Jessica.

[4] The testimony becomes a bit confusing because Otica Williams refers to the
bunkbeds as "the bed" and then distinguishes between the top and the bottom bunk.

R., that S. R. was on her stomach, and both of them still had their clothes on.  *Id.*, pp.

80-81.  She said that she never saw his penis.  *Id.*, p. 81.  She also said she never

actually saw them having sex.  *Id.*, p. 81.  She said that while this was happening,

Brionne and Jasmine were at the end of the bed.  *Id.*  Otica Williams said that the next

day, she told S. R. what had happened, that Petitioner was on top of her.  *Id.*, p. 82.

She said she did not tell S. R. that he put "his stuff in her stuff."  *Id.*, p. 83.

On redirect examination, Williams said that S. R. was moving around, wiggling,

while Petitioner was on top of her.  *Id.*, p. 83.  That night was the first time that Otica

Williams had seen Petitioner, and she had not seen him since.  *Id.*, p. 84.

Brittney Perry testified that she was then nine years old, and is S. R.'s sister.  *Id.*,

pp. 86-87.  Petitioner is her uncle.  *Id.*, p. 87.  Jessica is also her sister, and Brionne is

her brother.  *Id.*, p. 88.  She said that they had two big beds.  *Id.*, p. 89.  She said the

beds were "side by side," and one of them was a bunk bed.  *Id.*, pp. 89-90.  On the night

of the assault, she, Otica, and Jessica were sleeping on the bunk beds.  *Id.*, p. 90.

Jessica and Otica were on the bottom bunk bed.  *Id.*  Brionne and S. R. were on the

other bed (that was not a bunk bed).  *Id.*, p. 91.  She said that there was a night light on

in their room.  *Id.*  Brittney testified that at some point that night, Petitioner came into the

room and laid on top of S. R..  *Id.*, pp. 91-92.  She said that when she woke up, he was

gone.  *Id.*, p. 92.  She said S. R. was sleeping on her stomach.  *Id.*  She said that

Petitioner "had a pink bottle.  He put it on his stuff."  *Id.*, p. 93.  Something pink came

out of the bottle.  *Id.*  She said that Petitioner put the pink liquid on his hands first.  *Id.*, p.

94.  When asked to say what "his stuff" was, she said, "I don't say bad words."  *Id.*  She

then said "his stuff" was "what he goes to the bathroom with."  *Id.*  Brittney Perry said

that when Petitioner was lying on S. R., she was asleep but she was moving from side to side. *Id.*, p. 95. Brittney Perry said she was mad at Petitioner that night "for putting that pink stuff on his stuff," and her sister was mad too, "because I had told her." *Id.* She said that Petitioner hit her six year old sister in the face with a belt by accident that night. *Id.*, pp. 96, 100. She said that her mother was at the hospital with her daddy that night, and when she came home, Brittney told her mother that "he was touching [S. R.'s] stuff." *Id.*, p. 96. She also told S. R., Otica, and her little sister, and she told her aunt. *Id.*

On cross examination, Brittney Perry said that "his stuff" meant his penis. *Id.*, p. 98. She said that Petitioner lay on S. R. on the bottom of the bunk bed, and then she said it happened on a mattress on the floor. *Id.*, p. 101. She said S. R.'s brother was on the mattress on the floor also. *Id.*, p. 102.

Barbara Jones testified that S. R. is her great niece. *Id.*, p. 104. She said that her husband picked up the children the next morning, and brought them to her house. *Id.*, pp. 104-105. All of the children were talking, but S. R. was quiet, which was unusual. *Id.*, p. 105. She said that the children told her that Petitioner had "messed" with S. R.. *Id.*, po. 105-106. Brittney said that Petitioner beat all of the children. *Id.*, p. 106. Jessica said Petitioner beat her and was "following" S. R.. *Id.* Jones took S. R. into the bedroom alone, and S. R. was crying. *Id.*, p. 107. S. R. then told her that Petitioner followed her around, and touched her vagina (pointing) with his penis (his thing). *Id.*, pp. 108-109. Petitioner was also in the house at that time, and he denied doing anything. *Id.*, p. 109. S. R. was mad at him, and talked back at him "saying, you know you did this." *Id.*, p. 110. Petitioner was still drinking. *Id.* Four or five hours later,

said Jones, S. R.'s mother arrived.  *Id.*, p. 110.  The police were called after that.  *Id.*  Jones said that on another occasion, S. R. had complained that Petitioner had tried to "mess with her butt."  *Id.*, p. 111.

On cross, Jones repeated that S. R. said that Petitioner touched her vagina, not her anus.  *Id.*, p. 112.  S. R. did not tell Jones that "she, herself, didn't really know what happened, that she was sleeping."  *Id.*, p. 113.  Jones got the impression from S. R. that she, herself, knew what had happened.  *Id.*

Dion Roberts, Petitioner's cousin, said in the morning after the assault, S. R. said that the Petitioner "had put his thing inside of her."  *Id.*, p. 118.  She said that all of the children were trying to speak to her and to Jones at one time.  *Id.*  She said that after this, Jones spoke to S. R. alone.  *Id.*, p. 119.  Roberts said that she is eight years younger than Petitioner.  *Id.*, p. 122.  She said that when she was in elementary school, Petitioner "touched me in a way where I was uncomfortable."  *Id.*  He "stuck his hands in my underwear and in my vagina" in the bedroom at night when she was alone with him.  *Id.*, pp. 122-123.  She said she did not tell anyone because "I was a kid, and I didn't know any better."  *Id.*, p. 123.  She said she was 11 or 12 years old at the time.  *Id.*, p. 124.  She said that she "was definitely in bed."  *Id.*, p. 127.  When asked again about the fact that she never told anyone, she said:

> Back then they didn't tell you too much about child molestation as they do now.  I mean, if I would have know the way that they are telling stuff nowadays, I probably would have told a long time ago, and maybe none of this would have happened from the start.

*Id.*, p. 128.  Dion Roberts also testified that S. R. had complained sometime earlier about inappropriate touching by Petitioner.  *Id.*, p. 129.  She said she told S. R.'s father.  *Id.*, p. 130.

S. R.'s mother, Tamica Kelly, said that on that evening, New Year's Eve, she left the children with Petitioner in her residence at about 10:00 p.m.  *Id.*, p. 133.  She was going to a club with her former brother-in-law.  *Id.*  The plan was to be home by 1:00 p.m.  *Id.*  The former brother-in-law got into an argument with "his wife" and "he got stabbed 14 times."  *Id.*  She went to the hospital with him.  *Id.*  She said that after she "had finished dealing with the guy that I was with at the hospital," her father, Tommy Jones, told her that something had happened to one of her children, S. R..  *Id.*, p. 134.  It was obviously the next morning.  Kelly arrived "to the house" and S. R. was crying and said that Petitioner touched her "between my legs" with "his stuff."  *Id.*  She said that Otica "said basically the same thing."  *Id.*, p. 135.  Petitioner is Kelly's brother.  *Id.*, p. 136.

Police Officer David Gantt testified that he interviewed S. R., and she said Petitioner "had taken her pajamas off and had put his stuff in her stuff, is her wording exactly."  *Id.*, p. 152.  S. R. pointed at her groin area.  *Id.*, p. 153.  This interview occurred at about 3:00 p.m.  *Id.*, p. 154.  Gantt's impression that she was not describing anal intercourse.  *Id.*, p. 156.  The interview was at the hospital since S. R. was there for a sexual assault examination.  *Id.*  S. R. told Gantt that she was wearing pajamas and panties.  *Id.*, p. 159.

Officer Darrell Furuseth testified that S. R. told him that "she was in her bed when he entered into her bedroom, got into her bed, removed her pajama bottoms and

underwear.  And then she state[d] that he had put his stuff into her stuff."  *Id.*, p. 163.

He determined that this meant putting his penis into her vagina.  *Id.*  He said that S. R.

pointed to her vagina, and not her anus.  *Id.*, p. 170.  He said that S. R. did not mention

any pink lotion or liquid, and apparently no such bottle was found or seized.  *Id.*, pp.

172-173.  Officer Furuseth said that vaginal swabs were taken from S. R. at about 8:10

p.m. that evening, but she had taken a bath, and that "destroys" any forensic finding.

*Id.*, R. 174.

Kimberly Ellis, a forensic interviewer with the Child Protection Team with the

Children's Home Society conducted a forensic interview of S. R. on January 2, 2003.

*Id.*, pp. 177-180.  A video of the interview was played for the jury.  *Id.*, p. 181.  S. R. was

then nine years old.  *Id.*, p. 184.  S. R. said she was sleeping on a bed.  *Id.*, p. 192.  She

said there were two beds, one on the bottom and one on the top.  *Id.*, p. 193.  She was

sleeping on the bottom bed with her sisters, cousin, and brothers.  *Id.*  S. R. said that

"he came in my room and I was asleep" and she then woke up, saw a little hole in her

pants, and "he started pulling out his stuff and put it in mine."  *Id.*, p. 195.  She said that

he took her pants (pajamas) off and "throwed them on the floor where my dresser

drawer is."  *Id.*  She said she did not know if she was wearing anything beneath her

pajama bottoms.  *Id.*, pp. 195-196.  She said that Petitioner got on top of her, stopped,

said he would give her money, but never did.  *Id.*, p. 196.  S. R. said that her cousin,

Tyrone, got out of bed and "he went in there and messed with my cousin Tyrone."  *Id.*,

p. 197.  Tyrone was not in the room when this happened to her.  *Id.*  S. R. marked a

drawing of a man with no clothes, front and back, to show what she meant by "his stuff,"

and she did the same for a female drawing to describe "her stuff."  *Id.*, pp. 199-200.

She also said that Petitioner put his penis into her anus, and put something on his penis that came from a little pink bottle. *Id.*, pp. 200-201. S. R. also described other times that she had been touched inappropriately by Petitioner, "more than once." *Id.*, p. 203. She said that the last time, he did not pull off her pants, "he made two holes in my pants." *Id.* She said that he then put his penis on her. *Id.* S. R. then said that she was on the top bunk when she was assaulted by Petitioner. *Id.*, p. 213. She said her cousins, Tyrone and Otica, were on the top bunk with her. *Id.* S. R. marked both the vagina and the buttocks of the female drawing to show where Petitioner had put his penis. *Id.*, p. 219.

Ellis said that S. R. was not as advanced as a normal eight or nine year old child, "seemed to have difficulty with answering or providing information," and had language difficulties. *Id.*, pp. 221-222. Ellis admitted that S. R.'s description of who was in which bed was confused. *Id.*, p. 222. Ellis said that toward the end, S. R. said she had seen Petitioner's "stuff." *Id.*, p. 223. Ellis thought that S. R. was relating both what she had experienced and what her cousin Otica told her she saw. *Id.* Ellis said she did not ask S. R. whether she was lying on her stomach or back when Petitioner was lying on her. *Id.*, p. 224. The state rested. *Id.*, p. 225.

Petitioner recalled S. R.'s mother, Tamica Kelly. *Id.*, p. 236. She said that the room in which S. R.'s sleeps had a full or queen bed and a "lay-out bed" for when company comes over. *Id.*, p. 237. The second bed was a sofa bed from which a mattress was taken to lay on the floor. *Id.*, p. 239. She said that the children did not have a bunk bed at that time. *Id.*, p. 238. She said she had bunk beds, "but the bunk beds wasn't even up." *Id.* She denied that her daughter had ever told her that

Petitioner inappropriately touched her on an earlier occasion.  *Id.*, pp. 238-239.  She said the bunk beds were in a utility closet.  *Id.*, p. 239.

Petitioner testified.  *Id.*, p. 240.  He was 40 years old at the time of the trial, and 30 years older than S. R.  *Id.*, pp. 241, 251.  He denied that he sexually assaulted S. R.  *Id.*, p. 241.  He said his father took himself, S. R., Otica, Brionne, Tyrone, Brittney, and Tamica Kelly to the apartment.  *Id.*, pp. 242-243.  He waited for his father to "pay all of us."[5]  *Id.*, p. 243.  Tamica, his sister, then told him she was "fixing to go out."  *Id.*  He was not sure if she would come back.  *Id.*, p. 244.  She left him there with the children.  *Id.*, p. 244.  He said Jasmine's name was Jessica.  *Id.*  The children played.  *Id.*  Petitioner then went "to the store" and returned with three quarts of beer.  *Id.*, p. 245.  He spent time in the kitchen, then came out and saw Tyrone on top of Otica on the couch.  *Id.*, p. 246.  He told him to get off her.  *Id.*, p. 247.  He said he threatened them but "I never hit."  *Id.*, p. 247.  At about 11:00 p.m. he unplugged the fan, and S. R. and Otica got mad.  *Id.*  He then left and went to Monroe's Pool Hall.  *Id.*, p. 248.  When he got back, at about 3:00 a.m., S. R. and Otica were still up.  *Id.*  Brionne, Jessica, and Brittney were already in bed in S. R.'s room.  *Id.*  There were no bunk beds.  *Id.*  He ordered Otica to sleep in the living room and S. R. to go to her room to bed.  *Id.*  They went to bed.  *Id.*  He then went to the bedroom and S. R. was "messing with Brionne," trying to wake him up, and he told her to stop.  *Id.*, pp. 248-249.  He said that S. R. told him that he could not tell her what to do, and called him a bastard.  *Id.*, p. 249.  Petitioner pulled off his belt and tried to hit S. R. but hit Jessica instead.  *Id.*  He denied

---

[5] Petitioner worked for his father and probably had worked that Tuesday, New Year's Eve, or the Monday before that.

lying on top of S. R., taking out his penis, or putting his penis into S. R.'s vagina or anus. *Id.*, pp. 249-250.  Petitioner said that S. R. told him she would tell her mother that he had hit Jessica.  *Id.*, p. 250.  Petitioner said he had been convicted of a felony 11 times. *Id.*, p. 251.

On cross examination, Petitioner admitted he had been drinking beer before he came to that house that night and continued drinking the next day.  *Id.*, p. 252.  He said that at the house, he drank half a gallon of beer and a quart of a Smirnoff wine cooler. *Id.*  He drank two quarts of beer at Monroe's Pool Hall.  *Id.*, p. 253.  The defense rested and there was no rebuttal.  *Id.*, p. 255.

**Section 2254 Standard of Review**

Habeas corpus relief may be denied on the merits notwithstanding the failure of the petitioner to exhaust state remedies.  § 2254(b)(2).[6]  But habeas corpus relief may be granted only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1) and (c).  To do so the federal claim be fairly presented to the state court, to give the State the opportunity to pass upon and correct alleged violations of federal rights.  *See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995).  While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional claim is raised.  Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations

---

[6] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

omitted); *see also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding

that a petitioner must "do more than scatter some makeshift needles in the haystack of

the state court record") (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728,

1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying

this one complete round requirement to state collateral review process as well as direct

appeal). If a claim is not fairly presented through one complete round of state court

review and review is no longer available in state court, it is procedurally defaulted and

the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of

justice. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640

(1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113

L.Ed.2d 517 (1991).[7]

For a claim fairly presented and adjudicated on the merits in state court, and

pursued through one complete round of the review process, this court may reach the

merits if Petitioner shows that the state court's adjudication "was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or that the decision "was based on an

---

[7] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). *See also* House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2); <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146  L.Ed.2d 389 (2000).  Upon such a showing, this court reviews the federal claim on the merits without the deference otherwise afforded to the state court's determination.  <u>Panetti v. Quarterman</u>, __ U.S. __, 127 S.Ct. 2842, 2858-59, 168 L.Ed.2d 662 (2007); <u>Jones v. Walker</u>, 496 F.3d 1216, 1228 (11th Cir. 2007) (citing <u>Panetti</u>).

An adjudication of the merits, even without an explanation or written opinion, is enough for the deference of § 2254(d) to apply.  <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002) ("all that is required is a rejection of the claim on the merits, not an explanation."); <u>Parker v. Sec'y for the Dep't of Corr.</u>, 331 F.3d 764, 776 (11th Cir. 2003) (same); <u>Herring v. Sec'y for the Dep't of Corr.</u>, 397 F.3d 1338, 1347 (11th Cir.), <i>cert. denied</i>, 546 U.S. 928 (2005) ("[e]ven a summary, unexplicated rejection of a federal claim qualifies as an adjudication entitled to deference under § 2254(d).").

A presumption of correctness is accorded state court findings of fact by former § 2254(d), and now by § 2254(e), even if the state court did not hold a hearing with live testimony, but considered only affidavits, other evidentiary materials, and the trial record.  <u>May v. Collins</u>, 955 F.2d 299, 310 (5th Cir.), <i>cert. denied</i>, 504 U.S. 901 (1992), <i>citing</i>, <u>Sumner v. Mata</u>, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

> The fact that a 'live' hearing was not held is not controlling, and the state habeas court can generally even resolve conflicts in affidavits, where the judge who presided at trial also presides at the habeas hearing, as was the case here.

West v. Johnson, 92 F.3d 1385, 1411 n. 47 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242
(1997).  The presumption of correctness of state court factfinding may be rebutted only
by "clear and convincing evidence."  Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct.
2317, 2325, 162 L.Ed.2d 196 (2005), *citing*, § 2254(e)(1).

The law governing ineffective assistance of counsel claims was clearly
established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,
2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;
Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland,
Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or
omissions of counsel that are alleged not to have been the result of reasonable
professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim,
"counsel is strongly presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional judgment."  466 U.S. at
690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a
petitioner to show that the conduct was unreasonable, a petitioner must establish that
no competent counsel would have taken the action that his counsel did take."  Chandler
v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S.
1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing
Chandler).  There are no rigid requirements or absolute duty to investigate a particular
defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always
> better.  Stacking defenses can hurt a case.  Good advocacy requires

'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although <u>Strickland</u> explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

A state court's adjudication of an ineffective assistance claim is not "contrary to" the rule of <u>Strickland</u> for purposes of § 2254(d)(1) even if this court might have applied <u>Strickland</u> differently.  <u>Williams</u>, 529 U.S. at 406, 120 S.Ct. at 1520; <u>Bell</u>, 535 U.S. at 698, 122 S.Ct. at 1852.  To determine whether the state court's adjudication was an "unreasonable application" of <u>Strickland</u>, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  <u>Bell</u>, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* <u>Williams</u>).  "[T]he most important point is that an *unreasonable*

application of federal law is different from an *incorrect* application of federal law."

Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner contends that the state court erred when it denied his motion for judgment of acquittal.  Doc. 7, p. 4; p. 5 on ECF (as paginated by the electronic case filing system).  He contends that there were inconsistencies in the evidence, as to whether S. R. was awake or asleep during the assault, whether she had on pajamas bottoms or not, whether she was on the top bunk, bottom bunk, or there were no bunk beds, and whether S. R.'s testimony was based only upon what her younger sister told her the next morning.  Doc. 9, pp. 2-3; pp. 2-3 on ECF.

Respondent argues that Petitioner did not present a federal claim of a denial of due process on direct appeal and that this claim is procedurally defaulted.  Doc. 16, p. 8.  On direct appeal, Petitioner presented the following claim in his initial brief:

> Whether S. R.'s testimony was so equivocal as to whether she had personal knowledge of the assault, as opposed to merely recounting the events as told to her by Otica and Brittany, that the jury could not find the case for sexual battery was proved beyond a reasonable doubt, as a matter of law.

Ex. G, p. 13.  Petitioner argued that the State's case "depends entirely upon S. R.'s personal knowledge that Appellant's penis had 'union with' S. R.'s anus or vagina."  *Id.*  Petitioner cited the Fifth and Fourteenth Amendments to the United States Constitution and the Florida Constitution without further elaboration.  *Id.*

It is "an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a

reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979), *relying on* In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  The question is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319, 99 S.Ct. at 2789 (emphasis by the Court); Fallada v. Dugger, 819 F.2d 1564, 1570 (11th Cir. 1987).  "The *Jackson* standard,  which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction."  Schlup v. Delo, 513 U.S. 298, 330,  115 S.Ct. 851, 868, 130 L.Ed.2d 808 (1995).

The test is a limited one, and "[i]t is not required that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt."  Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir.), *cert. denied*, 484 U.S. 925 (1987).  "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief."  *Id.  Accord,* Carter v. Montgomery, 769 F.2d 1537, 1542 (11th Cir. 1985) (it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.)

The only cases cited by Petitioner in his brief on direct appeal were Tibbs v. State, 397 So. 2d 1120 (Fla.), *aff'd*, 454 U.S. 963, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1981) and  State v. Law, 559 So. 2d 187 (Fla. 1989).  Ex. G, p. 14.  State v. Law did not apply the federal due process standard.  It concerned the Florida rule that:

> Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.

559 So. 2d at 187.

In <u>Tibbs</u>, the Florida Supreme Court was concerned with the distinction between the sufficiency of the evidence and the weight of the evidence. The court said: "In the criminal law, a finding that the evidence is legally insufficient means that the prosecution has failed to prove the defendant's guilt beyond a reasonable doubt." 397 So. 2d at 1123. The court cited <u>Burks v. United States</u>, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). <u>Burks</u> was a Double Jeopardy case, and discussed the issue of the sufficiency of the evidence only as an issue for direct appeal, not as a due process question or on collateral review. The Florida Supreme Court in <u>Tibbs</u> did not discuss the leading case for the due process claim, <u>Jackson v. Virginia</u>, *supra*. When <u>Tibbs</u> was affirmed by the United States Supreme Court, that Court made clear that there is a difference between the sufficiency of the evidence on direct appeal and the sufficiency of the evidence to satisfy due process:

> [O]ur decision in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), places some restraints on the power of appellate courts to mask reversals based on legally insufficient evidence as reversals grounded on the weight of the evidence. We held in *Jackson* that the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. *The Due Process Clause, in other words, sets a lower limit on an appellate court's definition of evidentiary sufficiency.*

454 U.S. at 45, 102 S.Ct. at 2220 (emphasis added, footnote omitted).

In summary, Respondent's assertion that this claim was procedurally defaulted is correct. Petitioner mentioned the Fourteenth Amendment, but made no federal due

process argument and did not cite <u>Jackson v. Virginia</u> and related cases.  Petitioner procedurally defaulted this claim, and must show cause and prejudice for the default before this court can review the merits.

Petitioner cannot show either.  As <u>Tibbs</u> pointed out, the due process claim is harder to prove (from a defendant's perspective) than appellate insufficiency of the evidence because the due process standard sets a lower limit that the prosecution must meet.  Petitioner has not shown that no rational jury would have found the elements of the offenses beyond a reasonable doubt, considering the evidence in a light most favorable to the prosecution.  Ground one remains procedurally defaulted.

Indeed, even if there were no procedural bar, Petitioner's insufficiency of the evidence claim must fail.  There were conflicts in the evidence that were reasonably explained by the age of the children and the difficulties that S. R. had with language.  As the trial court noted in denying the motion to exclude the hearsay evidence of S. R.:

> She has described it in essentially the same way, either put his stuff in me, put his thing in me, to different people at different times, but that doesn't make it different.  I think it makes it the same.  And it uses childlike language, age consistent with her, but there is no doubt about what she is claiming.

Ex. E, p. 32.   The testimony of S. R. was corroborated by two other children.  The inconsistencies were of the type that are routinely resolved by a jury.  Ground one affords no relief.

**Ground Two**

Petitioner alleges that the trial court erred by admitting child and adult hearsay evidence of prior acts by Petitioner to show his bad character and propensity to commit the crimes charged.  Doc. 7, p. 4; p. 5 on ECF.  While this claim speaks of "hearsay"

evidence, it is only directed to the alleged erroneous admission of evidence of prior bad acts.  Doc. 8, pp. 3-4.  There is no legal argument concerning the propriety of hearsay evidence.  *Id.*  It is apparently Petitioner's intention to argue that the evidence denied a fair trial and this denied due process.

At trial, Petitioner moved to exclude hearsay evidence *from the victim*, S. R.  Ex. A, R. 38.  The motion did not mention hearsay evidence from any other child.

The motion also sought to exclude *Williams* rule evidence that Petitioner had molested other children in the past.  *Id.*, R. 36-38.  Williams v. State, 110 So.2d 654 (Fla.1959).

> Under the *Williams* rule evidence of other crimes, wrongs and acts is admissible if it is relevant to and probative of a material issue even though the evidence may indicate the accused has committed other uncharged crimes or may otherwise reflect adversely upon the accused's character.  Section 90.404(2)(a), Florida Statutes, (1983), codifies the ruling in *Williams v. State* and lists the purposes for which such evidence is deemed to be admissible: proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Buenoano v. State, 527 So.2d 194, 197 (Fla. 1988), *cert. denied*, 523 U.S. 1043 (1998).

The first prior bad act by Petitioner allegedly occurred in Tampa in March, 2001.  *Id.*, R. 36.  There was a police report that Petitioner provided beer and cigarettes for three children, and "told the children to remove their pants and improperly touched one of the children in her crotch area."  *Id.*  The second instance was presented at trial by Dion Roberts, that when she was in elementary school, Petitioner touched her inappropriately.  *Id.*, R. 37.

The motion as to the prior bad acts evidence was denied after two evidentiary hearings, finding that the pattern of molestation of children was sufficiently similar to be

admissible under Florida law.  Ex. E, pp. 25-30 (see pages 33-34 ahead for a full

discussion of these findings).  The court also denied the motion to exclude hearsay

evidence from the victim, S. R.  *Id.*, pp. 30-40.

On direct appeal, Petitioner argued only that the trial court erred in admitting the

hearsay testimony of child witnesses who were not actually victims of the crime.  Ex. G,

p. 16.  This was not the objection lodged below, and  in the Answer Brief the State

noted the lack of a contemporaneous objection.  Ex. H, pp. 8-9.

Thus, Petitioner did not appeal the issue of admission of *Williams* rule or bad acts

evidence.  Even if he had appealed this ruling, it was argued in the trial court only a

state law evidentiary issue, not a federal due process issue.[8]  The claim is procedurally

defaulted.  Neither cause nor prejudice has been shown for the procedural default.  See

the analysis of ground five, ahead.[9]  This court cannot reach the merits of the apparent

federal claim.


**Ground Three**

---

[8] An error of state law in the admission or exclusion of evidence is not, standing alone, a violation of due process.  Thigpen v. Thigpen, 926 F.2d 1003, 1011 (11th Cir. 1991).  "[I]f a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment," habeas relief is available.  *Id.*, 926 F.2d at 1012.   "An erroneous evidentiary ruling creates such fundamental unfairness when the wrongfully admitted evidence is 'material in the sense of a crucial, critical, highly significant factor.' " *Id.*

[9] Petitioner claims ineffective appellate counsel in ground five as cause for this default.

Petitioner asserts that his attorney was ineffective for failing to challenge the competency of S. R. to testify.  Doc. 7, p. 5; p. 6 on ECF.  He points to the comments made by the Child Protection Team witness, who said that S. R. had some difficulties with words and "seemed to have difficulty with answering or providing information, which is a little bit unusual for an eight year old."  Doc. 18, p. 18, citing Ex. B, trial transcript, p. 221.  Respondent concedes that state court remedies were exhausted as to this claim.  Doc. 16, p. 19.

The Rule 3.850 judge denied this claim, finding that there was no indication in the trial transcript to indicate that the victim was not competent to testify.  Ex. N, R. 16.  The court also ruled that the testimony of S. R. was corroborated by the eye witness testimony of two other children, who were present during the assault.  *Id.*  The court said that "[a]ny challenge by the defense would have been denied."  *Id.*

The judge who made this 3.850 ruling was also the trial judge, Circuit Judge Kathleen Dekker, who heard the trial testimony from S. R. and did not rely solely upon the transcript.  That ruling was affirmed *per curiam* by the First District Court of Appeal.  Ex. P.

As Respondent correctly argues, the competency of a witness to testify is a state law question.  Newton v. Kemna, 354 F.3d 776, 782 (8th Cir.), *cert. denied*, 543 U.S. 979 (2004).

Section 90.605(2), Florida Statutes (2006), provides that, as a matter of trial court discretion, "a child may testify without taking the oath if the court determines the child understands the duty to tell the truth or the duty not to lie."  In determining whether a child is competent to testify, "the trial court should consider (1) whether the child is capable of observing and recollecting facts, (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the

obligation to tell the truth." *Griffin v. State*, 526 So. 2d 752, 753 (Fla. 1st DCA 1988) (citing *Lloyd v. State*, 524 So. 2d 396, 400 (Fla. 1988)); *see also Z.P. v. State*, 651 So. 2d 213, 213-14 (Fla. 2d DCA 1995) ("When a child's competency is at issue, the court must determine whether the child is capable of observing, recollecting, and narrating facts in addition to whether the child has a moral sense of the duty to tell the truth."). A trial court's determination of whether a child "has sufficient mental capacity and sense of moral obligation to be competent as a witness" is subject to an abuse of discretion standard of review. *Lloyd*, 524 So.2d at 400.

In re G.S., 989 So. 2d 1282, 1283 (Fla. 2d DCA 2008).

We now know that had Petitioner's attorney at trial challenged the competency of S. R., the motion would have been denied. This is so because the Rule 3.850 court said so, and that ruling was affirmed on appeal. Ex. N, R. 16; Ex. P.

"It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.' " Herring v. Secretary, Dept. of Corrections, 397 F.3d 1338, 1355 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005), *citing*, Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir.1997) (citations omitted). Since the state court has ruled adversely to Petitioner as to the underlying state law claim, Petitioner's attorney could not have committed attorney error in failing to raise this claim, nor could there have been prejudice to the outcome. *Id.*; Callahan v. Campbell, 427 F.3d 897, 932 (11th Cir. 2005), *cert. denied*, 127 S.Ct. 427 (2006) (citing Herring). Consequently, Petitioner has not shown that the state court's adjudication of this claim of ineffectiveness "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1) and (2).

**Ground Four**

Petitioner claims that his attorney was ineffective for failing to request a jury instruction concerning the *Williams* rule evidence that he had molested other children in the past.  Doc. 7, p. 5; p. 6 on ECF.  He argues that the jury should have been instructed that the evidence was admitted only to show intent and knowledge, and not as direct evidence of guilt, and that this evidence played an important role in his conviction since there was no physical evidence of his guilt.  Doc. 8, p. 8.  Respondent concedes that state court remedies were exhausted as to this claim.  Doc. 16, p. 22.

The state Rule 3.850 court rejected this claim.  The court reasoned that since counsel had filed a motion *in limine*, trying to exclude the prior bad acts evidence, and the motion was rejected, there was no prejudice in failing to request a limiting jury instruction.  Ex. N, R. 16-17.  The court also noted a difference between FLA. STAT. § 90.404(2)(a), which codifies the *Williams* rule (see note 5, *supra*), and FLA. STAT. § 90.404(2)(b), which was more applicable to the evidence in Petitioner's case.  *Id.*, R. 17. The court observed that the evidence was of limited relevance, was brief, and was not mentioned at all by the State in final argument.  *Id.*

Section 90.404(2)(a) places limits upon the use of other wrongs or crimes:

(a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

FLA. STAT. § 90.404(2)(a).

Section 90.404(2)(b), however, provides:

(b) 1. In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of

other crimes, wrongs, or acts *of child molestation* is admissible, and *may be considered for its bearing on any matter to which it is relevant*.

2. For the purposes of this paragraph, the term "child molestation" means conduct proscribed by s. 794.011, s. 800.04, or s. 847.0135(5) when committed against a person 16 years of age or younger.

FLA. STAT. § 90.404(2)(b) (emphasis added).

Unlike ordinary *Williams* rule evidence, therefore, section 90.404(2)(b) permits

the use of prior acts of child molestation in a prosecution for child molestation to show

propensity to commit child molestation.  Mendez v. State, 961 So. 2d 1088, 1090 (Fla.

5th DCA 2007), *citing*, McLean v. State, 934 So. 2d 1248 (Fla. 2006):

Our disposition of this case is governed by section 90.404(2)(b), Florida Statutes (2006), and our supreme court's interpretation of that statute in *McLean v. State*, 934 So.2d 1248 (Fla. 2006).  Section 90.404(2)(b) authorizes the admission of collateral crime evidence in child molestation prosecutions for any relevant purpose, *including to corroborate the victim's testimony by showing that the accused had a propensity for such criminal conduct*.

*Id.* (emphasis added).  McLean v. State held that "section 90.404(2)(b) comports with

the requirements of due process of law when used as a conduit for evidence that

corroborates the victim's testimony that the crime occurred rather than to prove the

identity of the allege perpetrator."  934 So. 2d at 1251.  The Court also said that "if

requested, the trial court shall give an appropriate cautionary instruction both at the time

the evidence is presented and in its final charge to the jury."  *Id.*, at 1262.

Thus, had Petitioner's attorney asked for a limiting instruction, Florida Standard

Jury Instruction in Criminal Cases § 2.4 (2002) would have been given.  It probably

would have been modified not only to include the relevant portions of the standard jury

instruction itself, but it might have been modified to account for FLA. STAT. §

90.404(2)(b) (2001) to read:

> The evidence you are about to receive concerning evidence of other crimes allegedly committed by the defendant will be considered by you for the limited purpose of proving opportunity, preparation, plan, absence of mistake or accident, *or to corroborate the testimony of S. R. by showing that defendant had a propensity to commit the offenses charged,* and you shall consider it only as it relates to those issues.

> However, the defendant is not on trial for a crime that is not included in the information.

(Emphasis added.)  That these words would have been chosen by the trial court is

evident from the court's discussion of the reasons for permitting the prior bad acts

evidence.  *See* pages 33-34 ahead.  Even if the instruction had omitted the "propensity"

language, and had only instructed that it was admitted to corroborate the testimony of S.

R. (as was contained in the standard instruction at that time),[10] it is difficult to imagine a

---

[10] The trial was on August 10, 2004.  Ex. B.  The Standard Jury Instruction in Criminal Cases 2.4 was amended on August 30, 2007.  In re Standard Jury Instructions in Criminal Cases-Report 2007-01, 965 So. 2d 811 (Fla. 2007).  The amendment deleted the phrase "to corroborate the testimony of" the child victim.  The Comment cited FLA. STAT. § 90.404(2)(b) (2001), and implied that this change was intended to implement that statute in child molestation cases and deleted a reference to Heuring v. State, 513 So. 2d 122 (Fla. 1987) and other cases.  Heuring was a classic *Williams* rule case involving a charge of sexual battery upon a stepdaughter between the ages of seven and twelve.  At trial, evidence was submitted evidence that twenty years earlier, the defendant had sexually battered his daughter between the ages of seven and fifteen.  The Court noted that the evidence was not admissible to prove "propensity to commit the crime."  513 So. 2d at 124.  The Court also held that: "To minimize the risk of a wrongful conviction, the similar fact evidence must meet a strict standard of relevance.  The charged and collateral offenses must be not only strikingly similar, but they must also share some unique characteristic or combination of characteristics which sets them apart from other offenses."  *Id.*  After the enactment of FLA. STAT. § 90.404(2)(b) (2001), both of these rulings were found to be no longer applicable in a child molestation case where the prior bad acts were child molestation acts.  McLean v. State, *supra.*  Since section 404.90(2)(b) now permits such evidence to be admitted "*on any matter to which it is relevant,*" this amendment seems to leave a trial court entirely

defense attorney wanting an instruction that highlighted the fact that the evidence of earlier acts of child molestation corroborated the somewhat conflicting testimony of S. R.  The instruction might even have depicted Petitioner as someone who had a propensity to commit the offenses in that family setting, which would have been correct under Florida law as later decided by Mendez v. State.  Petitioner's attorney, therefore, did not commit error by declining to request such a jury instruction. Consequently, Petitioner has not shown that the state court's ruling, finding neither attorney error nor prejudice to the outcome, "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1).

**Ground Five**

Petitioner contends that his appellate counsel was ineffective for failing to raise the preserved issue of the denial of a motion for a new trial.  Doc. 7, p. 5a; p. 7 on ECF. The basis for a new trial, argues Petitioner, was that the trial court erred in permitting evidence of other acts of molestation, *i.e.*, the *Williams* rule evidence.  Doc. 8, p. 10; doc. 18, pp. 25, 41.  Respondent agrees that state court remedies were exhausted as to this claim.  Doc. 16, p. 26.

Ineffective assistance of appellate counsel claims are analyzed under the test enunciated in Strickland v. Washington.  Grubbs v. Singletary, 120 F.3d 1174, 1176 (11th Cir. 1997); Heath v. Jones, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*,

---

free to craft an instruction that identifies *any* matter as to which the evidence is relevant.

502 U.S. 1077 (1992).  With regard to attorney error, appellate counsel need not raise

every nonfrivolous issue.  Jones v. Barnes, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d

987 (1983).  "Experienced advocates since time beyond memory have emphasized the

importance of winnowing out weaker arguments on appeal and focusing on one central

issue if possible, or at most on a few key issues."  463 U.S. at 751-752, 103 S.Ct. at

3313.  The "process of 'winnowing out weaker arguments on appeal and focusing on'

those more likely to prevail, far from being evidence of incompetence, is the hallmark of

effective appellate advocacy."  Smith v. Murray, 477 U.S. 527, 536, 106 S.Ct. 2661,

2667 (quoting Barnes).

> "Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim
> based on counsel's failure to raise a particular claim, but it is difficult to
> demonstrate that counsel was incompetent.  *See, e.g., Gray v. Greer*, 800
> F.2d 644, 646 (C.A.7 1986) ("Generally, only when ignored issues are
> clearly stronger than those presented, will the presumption of effective
> assistance of counsel be overcome')."

Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000).  *See

also* Bundy v. Dugger, 850 F.2d 1402, 1411 (11th Cir. 1988), *cert. denied,* 488 U.S.

1034 (1989) (discussing Strickland, and Barnes).  To determine prejudice, the court

reviews the merits of the omitted or poorly presented claim, and will find prejudice only

where the claim would have a reasonable probability of success on appeal.  Heath v.

Jones, 941 F.2d at 1136.

     This claim was raised in a petition for writ of habeas corpus, which raised other

issues concerning the motion for a new trial which are not argued here.  Ex. K.  Ground

five here only concerns the evidence of other acts of molestation.  Attached to the state

court petition was the motion for a new trial which preserved this issue for appellate review.  Ex. K, R. 74-75.  The petition was denied without an opinion.  Ex. M.

Petitioner argues that the evidence of other wrongs was improperly admitted under the *Williams* rule standards because the offense involving Dion Roberts occurred 20 years earlier and the offenses were not sufficiently similar to the charged offenses. Doc. 18, p. 25.  Petitioner argues that an evidentiary hearing is required because the appellate court did not cause one to be held.  *Id.*, p. 27.

Two years after Petitioner's trial, the Florida Supreme Court decided the <u>McClean</u> case.  Reviewing prior case law, the court said:  "We have relaxed the requirement for strict similarly between the charged and collateral offenses in the familial context, but there must be some similarity other than the fact that both offenses occurred in the family."  934 So. 2d at 1258.  The Court said that the issue of similarity remains important, both to judge relevance and to ensure that the probative value is not substantially outweighed by unfair prejudice, confusion of issues, or misleading the jury. *Id.*, at 1259.  With respect to similarity, the Court said that the location, age and gender of the victims, the manner of molestation, the proximity in time to the charged offenses, the frequency of the prior acts, and the presence or absence of intervening circumstances, all should be considered.  *Id.*, at 1262.  Finally, the Court cautioned against allowing the evidence of prior bad acts to become a "feature" of the trial and said that the trial court must find that the prior acts were proved by clear and convincing evidence.  *Id.*

Even before Petitioner's trial, several courts had noted that § 90.404(2)(b) had relaxed the requirement of a "striking" similarity in child molestation cases.  *See* footnote

10, *supra*, discussing the Heuring case.  "When both the charged offense and the prior misconduct occurred within a family setting, the family setting was a shared factor sufficient to allow a larger discrepancy concerning other aspects of the two offenses, but the two events still must have had shared similarities."   McLean v. State, 854 So. 2d 796, 801 (Fla. 2d DCA 2003) (ruling below).  "The new evidence code provisions relaxed the standard even further, allowing the admission of other wrongful acts of child molestation without limiting them to similar acts."   Ortiz v. State, 869 So.2d 1278, 1279 (Fla. 4th DCA 2004), *review. denied*,  941 So. 2d 368 (Fla.2006) (Table), *cert. denied*, 127 S.Ct. 965 (2007).

The trial court set forth lengthy findings as to why the evidence of prior acts of molestation of children were admissible in this case.  Ex. E, R. 25-30.  With regard to the earlier incident with S. R., the court noted that "given it's the same child I think that adds much more to its probative value as to any possible accident, mistake, on the part of the defendant."  *Id.*, R. 25-26.  She also noted that S. R. had been told that if she were again molested by Petitioner, to report it.  R. 26.  With regard to the evidence from Dion Roberts, the court found the evidence "strikingly similar" in that it happened at night, others were in the house, and Petitioner had gotten on top of her.  *Id.*  The court found a "common theme" when the defendant is a baby-sitter or in a custodial position, either because he is related or living with one of the family members.  *Id.*  There was no question of identification, said the court, because Petitioner was known.  *Id.*  "All of the people that are involved in these incidents have reason to know the defendant and have identified him . . . ."  R. 26-27.  Other similarities that the court noted were that Petitioner was involved with alcohol, "especially beer," the victims were offered cigarettes and

beer, the victims were told not to talk about it, the victims were of similar ages, from seven to twelve years old, the offenses happened in a bedroom at night, not somewhere else, the touching occurred in similar places on the body, and there was no motive to falsely accuse Petitioner.  R. 27-31.

Given these noted similarities and the case law as it existed when Petitioner's appeal was active, the claim that Petitioner now argues would have had little chance of success.  It was not attorney error to fail to raise the new trial issue on appeal, and prejudice to the outcome has not been shown.  Consequently, Petitioner has not shown that the appellate court's rejection of this claim of ineffective assistance of appellate counsel "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1).

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Michael Houston challenging convictions for sexual battery on a child under 12 years of age by a person over 18 years of age and lewd and lascivious molestation, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2003CF13A1, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on October 28, 2008.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.